UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80093-CR-MARRA/HOPKINS

UNITED STATES OF AMERICA,

v.

HARRY NATHANIEL HIGHSMITH,

        Defendant.
_____/

OPINION AND ORDER GRANTING DEFENDANT'S
MOTION TO SUPPRESS STATEMENTS AND DENYING
DEFENDANT'S SECOND MOTION TO SUPPRESS STATEMENTS

This matter came before the Court on Defendant Harry Nathaniel Highsmith's Motion to Suppress Statements (DE 33) and Second Motion to Suppress Statements (DE 52). The United States has opposed both motions (DE 50, 61). An evidentiary hearing was held on the motions. Upon considering the motions, the evidence presented, the argument of counsel and otherwise being duly advised in the premises, it is HEREBY ORDERED AND ADJUDGED as follows:

**I. BACKGROUND.**

Defendant is charged with threatening to kill an Administrative Law Judge of the Social Security Administration's Office of Hearings and Appeals in violation of 18 U.S.C. § 115(a)(1)(B). On January 20, 2007, Defendant voluntarily sought admission into the Veteran's Administration hospital in West Palm Beach, Florida because of homicidal and suicidal ideations. Specifically, Defendant expressed a plan to shoot a Social Security Administrative Law Judge who had ruled against him in a Social Security proceeding and then he planned on shooting himself. Defendant sought treatment relative to the these ideations. Defendant was

admitted to the hospital for treatment and was placed on a locked psychiatric unit.

On January 22, 2007, Defendant met with staff psychiatrist Dr. Lantie Quinones. During the doctor's first meeting with Defendant, he repeated his homicidal thoughts toward the judge. Later in his evaluation, Defendant indicated he had a gun at home and the gun was the means he was going to use to kill the judge and then himself. Upon learning that Defendant had a gun at home which he intended to use to carry out his plan, the doctor sought permission from Defendant to contact his wife to verify the existence of the gun. Defendant refused to give his consent. Defendant continued to repeat his threats over the next two days. Based upon the repeated nature of the threats, the specific identity of the potential victim, Defendant's claim of possession of a gun and his refusal to allow the doctor to verify the existence of the gun, Dr. Quinones concluded that the threat was viable. After consultation with other members of the treatment team, Dr. Quinones determined that the judge and law enforcement authorities needed to be notified. Dr. Quinones advised Defendant of her intention to notify the judge of the threat. Notification was accomplished on January 24, 2007.

After law enforcement authorities were notified, Veteran's Administration Police Officer Terrence Mays went to the psychiatric unit to investigate. Officer Mays first met with Dr. Quinones who advised him of the threats. Officer Mays then asked to speak to Defendant with Dr. Quinones present. Dr. Quinones took Defendant into a conference room on the unit. Officer Mays then entered the conference room to engage in the discussion. During the discussion with Officer Mays, Defendant stated that he still felt as if he wanted to kill the judge.

On January 25, 2007, the day after law enforcement authorities were notified of the threats, Defendant told Dr. Quinones that he was no longer having homicidal or suicidal thoughts

2

or plans. On January 26, 2007, there was continued improvement in Defendant's condition. His suicidal and homicidal thoughts had resolved. At that point, Defendant did not meet any of the criteria for involuntary commitment, namely, where the patient is deemed to be a threat to himself or others. As a result, Defendant was discharged from the hospital. The indictment in this case followed.

## II. DISCUSSION.

### A. Is There a Dangerous-Patient Exception to the Psychotherapist-Patient Privilege?

Defendant seeks to preclude the United States from eliciting testimony from Dr. Quinones regarding his stated plan to kill the Social Security judge based upon the psychotherapist-patient privilege recognized by the United States Supreme Court in *Jaffee v. Redmond,* 518 U.S. 1 (1996). The United States, while recognizing the existence of the privilege and a psychotherapist-patient relationship between Defendant and Dr. Quinones, argues that the statements fall within what has been described as the "dangerous-patient exception" to the privilege. Defendant contends that such an exception should not be recognized in the law. After careful consideration of the few authorities on this question, the Court concludes that a "dangerous-patient exception" to the psychotherapist-patient privilege does exist.

A discussion of whether a "dangerous-patient exception" exists must begin with a review of the *Jaffee* case. In the course of recognizing the existence of this new privilege, the Court concluded "it was neither necessary nor feasible to delineate its full contours in a way that would 'govern all conceivable future questions in this area.'" 518 U.S. at 18. The Court then stated in a footnote that:

3

> Although it would be premature to speculate about most future developments in the federal psychotherapist privilege, we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist.

*Id.* n.19.

Since *Jaffee* was decided, three federal courts of appeal have addressed the question of whether footnote 19 recognized an exception to the privilege which would allow a psychotherapist to testify in a criminal case about confidential communications made by the patient. In *United States v. Chase,* 340 F.3d 978 (9th Cir. 2003) and *United States v. Hayes,* 227 F.3d 578 (6th Cir. 2000), the courts held that there was no "dangerous-patient exception" to the psychotherapist-patient privilege and absent a knowing and voluntary waiver, such testimony could not be admitted. The *Chase* and *Hayes* courts both interpreted footnote 19 in *Jaffee* as recognizing the duty a psychotherapist has to warn and protect third parties from serious threats of harm. *Chase,* 340 F.3d at 984; *Hayes,* 227 F.3d at 585. In *United States v. Glass,* 133 F.3d 1356 (10th Cir. 1998), the court held that a psychotherapist could testify about confidential communications if "the threat was serious when it was uttered and ... disclosure was the only means of averting harm to the [potential victim] when the disclosure was made." *Id.* at 1360.[1]

The Court concludes that footnote 19 in *Jaffee* was an acknowledgment of the existence of a narrrow exception to the psychotherapist-patient privilege. The Court agrees with the analysis of the dissenting opinion in *Chase* relative to the import of footnote 19. Although the

---

[1] The court in *Glass* held that on the record before it, the standard required for the admission of the confidential communications had not been met. The court remanded the case to the district court to make the appropriate factual determinations.

footnote is dictum, it carries substantial weight and cannot be read as merely recognizing the duty of a psychotherapist to warn third parties of potential danger or to testify in civil commitment proceedings. *Chase,* 340 F.3d at 995-96 (Kleinfeld, J. dissenting). The Court specifically stated that there were situations where "the privilege must give way." The privilege is to prevent the psychotherapist from testifying about confidential communications in federal court. The Court's use of the word *privilege* in a testimonial context cannot be construed to refer to either a *duty*[2] which state law might impose on a therapist, or an *authorization*[3] which state law might bestow on a therapist, to warn of potential harm to the patient or third parties. Thus, the Court holds that a psychotherapist may testify about confidential communications received from a patient "if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist."

      B.    *Do the Facts of this Case Meet the Requirement of the Dangerous-Patient Exception?*

In determining whether the facts of this case meet the requirements of the "dangerous-patient exception", the Court notes its agreement with the courts in *Chase* and *Hayes* that the question of when a psychotherapist has a duty to warn a potential victim of harm is separate and distinct from the question of whether the criteria for application of the "dangerous-patient exception" to the psychotherapist-patient privilege have been met. *Chase,* 340 F.3d at 986-89; *Hayes,* 227 F.3d at 583-84. In Florida, a psychiatrist may disclose patient communications to the

---

[2] *Tarasoff v. Regents of Univ. of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976).

[3] Fla. Stat. § 456.059(3)(the treating psychiatrist *may* disclose patient communications under certain circumstances).(emphasis added)

extent necessary to warn any potential victim or to communicate the threat to a law enforcement agency where the treating psychiatrist makes a clinical judgment that the patient has the apparent capability to commit such an act and that it is more likely than not that in the near future the patient will carry out that threat. Fla. Stat. § 456.059(3). To meet the requirements of the "dangerous-patient exception", it must be shown that a serious threat of harm can be averted only by means of a disclosure, a higher standard. Thus, in deciding the privilege question, it is unnecessary to consider whether the therapist, in making a disclosure, acted with the appropriate degree of professional care.

      In the present case, the disclosure, while probably appropriate under § 458.059(3) of the Florida Statutes, was not the only means by which harm to the judge could have been averted at the time the disclosure was made. *See Glass,* 133 F.3d at 1360. At the time of disclosure, Defendant was in a locked psychiatric unit in a hospital. The weapon he intended to use to carry out his plan was allegedly at his home. Defendant never sought to leave the locked psychiatric unit while he was continuing to have the homicidal and suicidal ideations, nor did he indicate that he would attempt to carry out his plan through third parties. *See* Transcript of Testimony of Dr. Quinones at 51. Moreover, Dr. Quinones admitted that as long as Defendant remained on the locked psychiatric unit, he was not a threat to the judge. *Id.* at 74. Although Defendant voluntarily admitted himself into the hospital, at the time of the disclosure he was continuing to have the homicidal and suicidal ideations and was still a threat to himself and the judge. Hence, he would have been involuntarily committed if he sought to leave. *See id.* at 51.

      Furthermore, the day after the disclosure, Defendant's condition improved. *Id.* at 26, 32. The improvement continued the next day and was such that Defendant no longer met the criteria

for continued commitment.  Thus, Defendant was no longer a threat to himself and others.  *Id.* at 32-33, 50-51.  As a result,  Defendant was released.

As previously discussed, in order to meet the "dangerous-patient exception", disclosure must be "the only means of averting harm to [the potential victim] when the disclosure was made."  *Glass,* 133 F.3d at 1360.  In this case, disclosure was made while Defendant was in a locked psychiatric unit where his treating psychiatrist admitted he was not a threat to the judge.  Under the test pronounced by the Court in *Jaffee,* and applied in *Glass,* disclosure was not the only means of averting harm to the judge.  His continued presence in the locked psychiatric unit, which at the time of the disclosure was within the control of the treating psychiatrists, averted harm and the need for disclosure.

The government might argue that disclosure would have occurred in any event because at the time of Defendant's release from the hospital Dr. Quinones could not predict Defendant's future conduct with any degree of certainty.  *See* Transcript of Testimony of Dr. Quinones at 74-75.  First, it seems counterintuitive to conclude that Defendant was no longer a threat and could be released, yet at the same time conclude that the only means of averting harm to the judge was to disclose the threat.  *See Glass,* 133 F.3d at 1359 (where the defendant's psychiatrist implemented a course of treatment which included discharging him from hospital supervision, such circumstances "are hardly an indication of a threat which can only be averted by means of disclosure").  Second, the Court cannot speculate as to what the result might have been under a different set of facts.  Hence, the Court finds that the facts of this case do not fall under the "dangerous-patient exception" to the psychotherapist-patient privilege.  Defendant's motion to preclude Dr. Quinones from testifying regarding communications between her and Defendant is

7

granted.

        C.      *Does the Court's Finding that Defendant's Statements to Dr. Quinones are Protected Under the Psychotherapist-Patient Privilege Require the Suppression of Defendant's Statements to Officer Mays?*

Defendant argues that his statements to Officer Mays were obtained as a direct result of the violation of his psychotherapist-patient privilege and therefore must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471 (1963). Because the violation which occurred in this case stems from a testimonial privilege, and not from the violation of a constitutional right, Defendant's argument fails.

In *Oregon v. Elstad,* 470 U.S. 298, 305 (1985), the Court stated that the defendant's claim that his confession should be "excluded as 'fruit of the poisonous tree' assumes the existence of a constitutional violation." In commenting on the holding of *Michigan v. Tucker,* 417 U.S. 433 (1974), the Court in *Elstad* also stated that: "[s]ince there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed." *Id.* at 308. The psychotherapist-patient privilege is not constitutionally based. It is a federal evidentiary one. *Henry v. Kernan,* 197 F.3d 1021, 1031 (9th Cir. 1999). As a result, otherwise admissible evidence derived from statements made by Dr. Quinones which are protected by an evidentiary privilege need not be suppressed. *See United States v. Squillacote,* 221 F.3d 542, 560 (4th Cir. 2000)(evidence derived from privileged conversations where the privilege is not constitutionally-based will not be suppressed); *United States v. Elie,* 111 F.3d 1135, 1142 (9th Cir. 1997)("fruit of the poisonous tree" doctrine only applies to evidence obtained from constitutional violations); *Nickel v. Hannigan,* 97 F.3d 403, 409 (10th Cir. 1996)(the court declined to apply the "fruit of the

8

poisonous tree" doctrine to the possible breach of the attorney-client privilege); *United States v. Marashi,* 913 F.2d 724, 731 n.11 (9th Cir. 1990)("Suffice it to say that no court has ever applied [the "fruit of the poisonous tree"] theory to *any* evidentiary privilege."); *United States v. Segal,* 313 F. Supp.2d 774, 780 (N.D. Ill. 2004)(the violation of a defendant's attorney-client privilege does not require the suppression of derivative evidence because the privilege is an evidentiary one, not a constitutional right).[4]

> D. Should Defendant's Statements to Officer Mays be Suppressed Because Defendant Was not Given a Miranda Warning?

Defendant also asserts that any statements made by him to Officer Mays should be suppressed because he was not given a *Miranda* warning. Defendant claims that he was in custody at the time he spoke to Officer Mays, thus triggering the need for a *Miranda* warning. The Court finds that Defendant was not in custody at the time of his discussion with Officer Mays and therefore a *Miranda* warning was not required.

Defendant was in a locked psychiatric unit at the time his statements were made to Officer Mays. Defendant was not in a jail or the back of a police vehicle, nor was the area in which he was confined in any way related to a law enforcement agency. Moreover, Defendant's confinement was for reasons unrelated to his encounter with Officer Mays. Defendant voluntarily submitted himself to that confinement for psychiatric treatment. While Defendant's interaction with Officer Mays related to an investigation of alleged criminal activity, he confinement did not. Thus, his mere presence on a locked psychiatric unit did not render him in

---

[4] " The Court notes that this is not a case where law enforcement or anyone associated with the prosecuting authorities were involved in procuring a violation of Defendant's privilege. *See United States v. White,* 970 F.2d 328, 335 (7th Cir. 1992); *United States v. SDI Future Health, Inc.,* 464 F. Supp. 2d 1027, 1053-54 (D. Nev. 2006); *Segal,* 313 F. Supp. 2d at 780.

custody.

Rather, the question is whether it was evident, under the totality of circumstances, whether a reasonable person in Defendant's position would have felt a restraint on his freedom of movement fairly characterized as "that degree associated with a formal arrest" to such an extent he would not feel free to leave the conference room in which he was being interviewed by Officer Mays. *United States v. Phillips,* 812 F.2d 1355, 1360 (11th Cir. 1987).  The question is not whether Defendant felt free to leave the psychiatric unit in which he voluntarily placed himself.  Neither Defendant, nor a reasonable person in his position, would not have felt free to leave the conference room where he was being interviewed by Officer Mays.  Defendant was free to move about the psychiatric unit with the other patients.  In the past, when Defendant did not wish to continue to talk with Dr. Quinones he would ask the doctor to leave.  When Defendant met with Officer Mays, Dr. Quinones was present.  Defendant was asked about the threats he made and voluntarily discussed them.  Defendant was never placed under arrest and was free to leave the conference room or discontinue the discussion as he had done with Dr. Quinones in the past.

After Officer Mays completed the interview, Defendant was allowed to leave the conference room.  Officer Mays remained on the psychiatric unit preparing his report.  While he was doing so, Defendant felt free to approach Officer Mays to discuss his Social Security case.  All of these circumstances demonstrate that Officer Mays' discussion with Defendant was not custodial in nature and Defendant was not entitled to a *Miranda* warning in order for his statements to be admitted.  *See United States v. Martin,* 781 F.2d 671, 673 (9th Cir. 1985)(defendant who voluntarily went to a hospital and was interviewed there by law

enforcement officers was not in custody for purposes of a *Miranda* warning). As a result, Defendant's Second Motion to Suppress Statements is denied.[5]

### III. CONCLUSION.

Based upon all of the foregoing, Defendant's Motion to Suppress Statements, DE 33, is **GRANTED.** Defendant's Second Motion to Suppress Statements, DE 52, is **DENIED.**

Done and ordered in Chambers in West Palm Beach, Palm Beach County, Floirda, this 20th day of August, 2007.

KENNETH A. MARRA
UNITED STATES DISTRICT JUDGE

Copies to:

Lauren E. Jorgensen, Esq.
Peter Birch, Esq.

---

[5] Defendant has also raised a due process argument in support of his motions. The Court rejects Defendant's due process claim.